Good morning, your honors. May it please the court, Keith Hilzenbecker with the Office of the Federal Public Defender in Phoenix for the defendant in this matter, Arturo Astorga-Gonzalez. This court should vacate the conviction and remand for a new trial in this case because the trial judge did not instruct the jury on what was really the crux of the defense in this case, the affirmative defense of entrapment by estoppel. And we're really talking about a sua sponte instruction, right? That's correct, your honor. Because defense counsel neither requested it nor objected to the instructions as given. That's correct, your honor. So then we're looking at plain error? Yes, your honor. That's why I wanted to make sure where we were. Right, right. And plain error. That would mean, you know what, that suggests as well, I guess. There was an error, it's plain, and it's so bad we need to do something about it. That's correct, your honor. And the case that I would refer the court to is the decision I rely heavily on in my opening brief, United States v. Baer, because I don't see any difference between this case and Baer. Well, let me ask you this. You know, what evidence can you point me to in the record where the border guards, to what the border guards specifically told Estorga? Because he's got to rely on something that the border guard told him. And I don't see any evidence in the record of anything that the border guard told him. My client testified that he was stopped at the port of entry on Saturday. What evidence is of what the border guard says? I mean, it's what your client thought. He talks about, well, I thought this because. Because they let him into the United States. Yeah, but what did the border guard say? Well, there's no evidence in the record about what any particular border guard said, because none of the border guards who were working there on Saturday were called to testify. So wouldn't you have to have something like that to show plain error to get this instruction? No, your honor. In Behr, the defendant testified that, well, I thought that this cop who was working for the DA, who turned out to be corralled or whatever, authorized me to make these drug sales. And that was the testimony that this court relied on to find that the defense that Ms. Behr was relying on was an affirmative defense of public authority. My client testified here, and he said, well, it looked to me, based on what happened, that they let me into the United States after I showed them my expired green card and this fingerprint notice. It looked to me, my client said, that they were allowing me into the United States for the purpose of attending this appointment. And if in Behr it was sufficient for this court. That's not a key fact. The problem is he had been deported. I mean, that's not something he told the officials. He presented an expired green card. Right. Here's my green card. Here's a letter. And missing from the story was that I had just been deported. My green card is not just expired. It's no good. It's revoked. So my client testified that. The border guards left the room, which was ample opportunity for them to do a background check. Hmm, this green card's expired. Maybe we should check into it. And that was ample opportunity for the border guards to discover they'd been deported, such that when my client returned, he could reasonably rely on the fact that they'd done this background check, determined that he's deported, and nevertheless said, but it's okay for you to come in to attend this fingerprint. That's a lot of inferences. But those are inferences that the jury was entitled to draw if they'd been properly instructed. Well, let's assume that. Let's give you that. Okay. Let's give you that. But consider the defense that he put on. They didn't believe your client. So why would he be successful on this estoppel defense? Because they didn't believe him. They obviously didn't believe because the backside of it, you know, oops, accidentally, the backside where it says you can't come in is gone. They don't believe him. But again, Your Honor, that's exactly what happened. The jury in there didn't believe the defendant. And this court said that if the jury had been properly instructed, the jury could have both found all the elements of the crime and also potentially believed her affirmative defense. Here, the jury could have believed, well, my client had the conscious desire to enter the United States because he walked back on Thursday and presented the same documents. He knew he'd been deported because there was ample evidence in the record to show that he'd been advised in 2004 when he was deported that he was never allowed to come back. And they could have believed all of that and also believed that my client may have been relying on the advice that he said he got from the border patrol guard, the border guards, but without a vehicle for crediting that, without an instruction that allowed them to give him this affirmative defense, the jury had no other choice than but to convict my client. Well, my worry is that we're on clear air here, and if we're going to prove, if we're going to say this is entrapment by estoppel, you have some elements to prove, that your client has elements to prove. And my good client, Judge Silverman, hit on the one which I was most concerned about, and the second is the official is made aware of all the relevant historical facts. There's no evidence that your client advised the inspectors he'd been deported, no evidence that the LPR status was revoked, or that he'd been convicted of felony. He didn't tell them any of that. Well, so how do I suggest on clear air review that the official was made aware by your client of all relevant historical facts? I don't clear air review. Right. I don't interpret the element that requires the official to be made aware of all the relevant facts to require the defendant to make them aware. Well, isn't it your client's must prove? Batter G. says your client must prove the authorized official is authorized to render advice. We skipped over that, which I'm not sure. Number two, official is made aware of all relevant historical facts. They don't say the government has to say that. It's your client that has to prove that. My client showed them an expired green card. That's all he did. Isn't that all he did? That's all he did. All right. There was testimony presented at the trial that suggested one of the purposes of making the green card expire is to trigger some sort of review. Assuming that my client had never lost his resident alien status, his green card would have expired and he would have gone to just submit relevant information that would have allowed the government to do a background check. This is an analogous circumstance. By showing the border guards this expired green card, they were on notice that maybe they should look in to discover, well, what was the reason for the expiration? Is it just a mere passage of time? Is there something else lurking here that maybe we should know about through other sources of information? What do I do to get to the authorized official is authorized to do what he had to do? These people court officials. Right. What do I get to suggest that they have the permission to say you can come any time you want to? All they have to be able to do is say that you've been given permission, and they're definitely authorized to say that a person has permission. Well, even if they miss one time, I'm understanding they can stop you the next. Right. Court officials admit you. You go through one time. That doesn't mean they've got to let you in every time. Let's suppose we give credit to your client that he missed one time. Could have gone. Didn't. Now, what is there in anything that I have that suggests that because they missed him one time, they couldn't stop him the next? It's not that they can't stop him, Your Honor. It's that once he comes back a second time, it's whether he reasonably relied on what happened the first time. You've got about a minute. If I may, I'd like to reserve the floor to you, Your Honor. Thank you. Good morning, Your Honors. Erica McCallum, representing the government. I'm here from the District of Arizona. It looks like we're focusing on the affirmative defense, and I would just emphasize that the defendant has just conceded that this is a plain error analysis here.  In support of that affirmative defense, particularly the prong that says that the defendant has to make the official aware of all of the relevant facts. Not only did he not tell them that he'd been deported at either visit, if in fact there were two visits to the port of entry, and the computer records only show the one visit at which he was arrested. So there's absolutely no corroboration whatsoever for his testimony. He alleges that he asked a border guard whether he could enter the United States. What is the evidence in this record that a request would have been officially recorded? There was no evidence. But would that generally, would that be the way something like that would be handled? Would you record something like that? Yes, what would happen? What was the evidence in this record about that issue? There was an absence of evidence in that if he had gone to the port of entry on Saturday as he claims, presented his revoked, not expired, but revoked LPR card and the appointment notice, then what the border officials would have done would have been to run that card through the computer, looked at the records to see whether he had official permission to reenter the United States. And when that card was run, when that data was run, a record would have been created. So at trial there was testimony from the agent who went back and checked all of this defendant's entry records and there was a single one from the time he'd been deported and that was the day of the arrest. So there's no record he even went to the port on Saturday. But if he had, he did not tell, he testified. He didn't tell the agents he'd been deported. He didn't say I've had two prior felony convictions. He didn't say I was warned not to reenter when I was deported. And he didn't say my LPR status was revoked. And he didn't make any of those statements when he did present at the time he was arrested. So it's your position that that would have had to have been done to create a sua sponte duty? Yes. And in addition, in addition, he should have at the time that he presented on the day of his arrest, he should have told the officials, you know what, I was here last Saturday and I was told I could come back. Now there's no evidence of that either, which would have been necessary for that problem of the affirmative defense. Well, now there was something, what do we have in the record concerning how a letter for appointment to replace an alien registration card is generated? And could the government send such a letter out without a request from the alien? What's in the record about that? What the record shows is that there was an I-90 application, which is not an application for permission to reenter. That's an I-212. It's an application to replace an expired or lost LPR card. That application had been sent from the defendant's mother's home address in California to a processing center in Phoenix, Arizona. What happens at the processing center is the computer generates a letter setting an appointment. At the location where the application comes from, so in California, and the appointment is to collect data from the defendant, fingerprints, photograph, and run a criminal history. So is there evidence in the record that that letter would have to come from a request, that in the record the request shows that it came from his mother's residence? Yes, there's evidence that the return address on the envelope was the mother's address. There's evidence that the application listed the mother's address as the defendant's home address. And there's evidence the application also contained a statement that the defendant's LPR status was current. The defendant testified he didn't know anything about an I-90 application. He didn't submit the application. His testimony was I got this appointment notice. So he said he got it from the government. And the evidence that the government put in the record was this is how it came about. So that was presented to the jury. Now, there was also the missing back page. The back page says something. Yes, but just to clarify, the defendant testified I got the letter from my brother. He drove from California to deliver it to me at the court on that Saturday prior to my arrest, which would indicate to the jury at that point if the defendant had been given permission to cross, he could have gotten in the vehicle with his brother and returned to California for the appointment, which was less than a week away. Just as an aside, and now I've forgotten your second question. The back page. Yes. The second page, if you look at excerpt of record, supplemental excerpt of record, page 49, there's a copy of that application, both pages. And the testimony from the custodian of records is that is the actual application that the defendant presented at the point of entry. And it had two sides. And the defendant testified I read this thing 20 times. Let me ask you, I have two questions. First, this counsel says this case is basically indistinguishable from BEAR. What's your answer to that? I think that this case is much more comparable to the Battergy and the Townage cases, which are involved individuals who purchase firearms. And it turns out what they've done is they've relied on statements from federal firearms licensees, gun sellers, who said in each of the cases, and they're authorized by the government to review paperwork and to review backgrounds and to say, yes, people are allowed to purchase the firearms they're requesting. In each of those cases, the FFL told the defendant, you've given me the right paperwork. It's okay for you to buy a gun. And then it turned out it was illegal. What was the story in BEAR? The story in BEAR? I'm sorry, you're going to have to. I'm just, I'm having a brain fart here. He says that they're indistinguishable. I was going to, my colleagues stole my question. How do you distinguish BEAR? Okay, the BEAR case was the individual who said that he thought that he had permission to run drugs, correct? And I'm sorry, my focus has been on these FFL cases because I think they're much more analogous to this case. So I'm not up to speed on the case of BEAR. Let me ask you a second question. They also raise an ineffective assistance of counsel claim for counsel's failure to ask for the instruction, which triggers the plain error to begin with. Sure. Can we deal with that now, or do we have to abstain and let the 2255 work its way? I don't think that the record is sufficient to explain the reasoning that went on behind the scenes for the decision to put on defense, which was to attack an element, or to say that the government did not provide sufficient proof to prove that element of the case. I don't think that, and this court requires that defense counsel have an opportunity to explain what his, the reason for his strategy was. However, if the court decides that it does want to look at whether there was an effective assistance, that the record is sufficient, then I think, and we give deference to, of course, the defense counsel's trial tactic. I think that this court should take into consideration that if defense counsel had chosen to put on this affirmative defense, then one of the key facts in that defense would have been what we've been talking about today, which is. I'm kind of puzzled. If in order to get this kind of instruction, if it had been requested, if it had been requested, in order to get the instruction, he would have had to have introduced evidence that he told the whole story to the border people. Since the evidence doesn't show that he told the whole story, how can there be an effective assistance in not requesting the instruction because he wouldn't have been able to get the instruction? Exactly. So your answer, it seems to me, to us should be we can put this ineffective assistance of counsel claim out of its misery now. We don't have to wait for the 2255. You could. You could do it on that basis, or you could say, look, by presenting that evidence, or not being able to present that evidence that the defendant gave all the information that he needed to, that it actually would have weakened an alternate defense, which would have been the specific intent element. In other words, it would have highlighted the weakness in the defendant's case. I see you've got a few seconds left. Do you want to sum up? I was going to say, do you want to comment about the motion to strike? Yes. The defendant at trial did not testify that he relied on that appointment notice as the reason for his thinking he could reenter the country. And it was not raised on the direct appeal. That argument was raised with information that's not in the record that came up subsequent to the appeal. And so, therefore, I think that argument should be not considered and the record should be straight. What if we considered it? What if you consider it? I think that the clear language of the appointment notice put the defendant on notice that that was not permission for him to reenter, especially when you consider the fact that the defendant said, I didn't file an I-90 application. I don't really know where this came from. We're talking about the press release, right? That's what the motion for strike and request for judicial notice. I think that's what you're talking about here. But what the press release says is the appointment notice perhaps is ambiguous, so we're going to clean up the language of the appointment notice. That's what the press release says. But that press release came out well into this appeal and was not on the record below. And so, if you have no further questions, I ask you to affirm. Thank you. In the minute and a half I have left, I want to work backwards through the presentation that my colleague just made. And to begin with the motion to strike, I responded to that. I said it was a subject of judicial notice. The government has never said it's not a proper subject of judicial notice. And so I'll just leave it to the Court's discretion to do with my judicial notice request whatever it deems fit. With respect, Judge Silverman. Well, if you take judicial notice of it, I don't see how it helps you win or lose anyway. I mean, let's assume that we do take judicial notice of it. It did add color to my argument, and that was, frankly, the main reason that I added it. Okay. Judge Silverman, with respect to your comments about the ineffective assistance claim that I've raised, I – first of all, because I look at Bayer and I see this case as presenting an affirmative defense as the backstop or the flip side of the coin to the defense that was presented, the attacking an element. I think they're part and parcel of one another, and – Would you remind us of the facts of Bayer? Bayer is a case where it was a conspiracy to distribute drugs. The defendant said, well, I wasn't – I'm not a conspirator here because I was, in fact, acting as a government agent, as authorized by this L.A. Sheriff's Department office. And the primary defense there was, well, you should believe me over this cop. And in the alternative, her defense was I was acting as a government agent because, you know, I had been doing controlled buys for her and that gave me a public authority to do this kind of thing. Here, it's the same sort of thing. You should believe me, you know, this is about a glimmer of hope that I got from these Border Patrol agents. Look at the clues about the glimmer of hope that I got from the Border Patrol agents. You should believe me because here I relied on the advice of the government. Let me ask you this. If we were to hold that, as a matter of law, you're not entitled to this instruction, whether it was requested or not, because he left out a key fact that you'd have to know, namely that he had been deported, then your ineffective assistance at counsel argument has to necessarily fail, doesn't it? Well, I would prefer that this court deferred to 2255 percent. I know. I'm not asking if you prefer. I'm asking you would it necessarily fail, wouldn't it? Well, only with respect to the jury instruction because that's the only ineffective assistance claim that's presented here. Right. I mean, if he's not entitled to the instruction as a matter of law, the fact that counsel didn't request it can't be ineffective assistance at counsel. I would see that as prejudicial to a claim in a 2255 proceeding where, you know, defense counsel didn't cross-examine a number of witnesses, defense counsel didn't. I'm talking about the instruction. Right. And so. If you don't request an instruction. Let me put it another way. Okay. If you don't request an instruction, you're not entitled to, it can't be ineffective assistance, right? But, yes, Your Honor. But on this record, there isn't enough other evidence that maybe defense counsel unreasonably failed to present that taken together with a request for jury instruction might get him one. Okay. Judge, go ahead. But who raised the ineffective assistance on this direct appeal? I'm sorry? Who raised ineffective assistance on direct appeal? I did. And now you don't want us to decide it? If you – because the record may not be adequately developed. Well, then why did you raise it? Because relying on the Alfaragin case, I took the position that the case is – this defense is adequately developed. If you see the record. So if you win on that, we should decide it. But if you lose on that, we shouldn't decide it? Yes, Your Honor. Okay. Just making sure I understand. Okay. Thank you, Your Honor. The case was heard. It is submitted. Thanks.
judges: Silverman, Callahan, Smith